# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

GREG DEHRING,

     *Plaintiff*,

*v.*

KEYSTONE SHIPPING CO.; KEY LAKES,
INC.; GREAT LAKES FLEET, INC.; CANADIAN
NATIONAL ILLINOIS CENTRAL RAILROAD;
CANADIAN NATIONAL RAILWAY COMPANY;
ILLINOIS CENTRAL RAILWAY COMPANY;
GRAND TRUNK CORPORATION; BENSON
ELECTRIC;

     *Defendants*.

_____/

CASE NO. 10-CV-13959

DISTRICT JUDGE THOMAS LUDINGTON
MAGISTRATE JUDGE CHARLES BINDER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT BENSON ELECTRIC'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
(Docs. 80, 83)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant Benson Electric's Motion for Summary Judgment (Doc. 80) be **GRANTED** and that Plaintiff's Motion for Partial Summary Judgment (Doc. 83) be **DENIED**.

## II.    REPORT

### A.    Introduction and Factual Background

In October 2007, while working aboard the vessel Cason J. Callaway in the Soo Locks, Michigan, both of Plaintiff's thumbs were severed when a mooring line was reeled in by a winch that was located behind him, resulting in permanent injury. (Doc. 1 at 4.) Plaintiff's complaint avers the following claims: (1) negligence under the Jones Act, 46 U.S.C. § 688 *et seq*., against

the Shipowner/Operator Defendants[1]; (2) unseaworthiness against the Shipowner/Operator Defendants; (3) negligence by the Manufacturer Defendants[2]; and (4) strict product liability of the Manufacturer Defendants. (Doc. 1.) On November 30, 2011, United States District Judge Thomas L. Ludington referred the case for pretrial case management. (Doc. 25.)

On September 17, 2012, Defendant Benson Electric ("Defendant Benson"), the designer and manufacturer of the winch controls and winch stand, filed the motion for summary judgment that is before the Court. (Doc. 80.) Plaintiff responded (Doc. 88) and Defendant Benson replied. (Doc. 89.) On the same date, Plaintiff filed a motion for partial summary judgment, asserting that he "is entitled to partial summary judgment with respect to liability under his theories of negligence, unseaworthiness, failure to warn, and product liability including defective design" (Doc. 83, Br. in Supp. of Mot. at 22), to which Defendant Benson (Doc. 85) and the Shipowner/Operator Defendants (Doc. 86) responded. Oral argument was held on both motions on November 13, 2012. The motions are therefore ready for report and recommendation.

Plaintiff is a 51-year-old man who worked as a seaman for most of his adult life. (Doc. 80 at 12.) On October 18, 2007, Plaintiff was working as an Able-Bodied Utility ("ABU") seaman on the Cason J. Callaway, which was transiting north on the St. Mary's River, bound for Duluth, Minnesota, heading for the Soo Locks. (Doc. 83 at 8.) Before the vessel could enter the Soo Locks, a temporary tie-up was needed to wait for the traffic ahead to pass. (*Id.*) At that time, Captain Wolfe, First Mate Bautzmann, and Wheelsman Watucki were also on watch with Plaintiff. (Doc.

[1]Defendants Keystone Shipping Co.; Key Lakes, Inc.; Great Lakes Fleet, Inc.; Canadian National Illinois Central Railroad; Canadian National Railway Company; Illinois Central Railway Company; and Grand Trunk Corp. are referred to collectively as the "Shipowner/Operator Defendants."

[2]The Manufacturer Defendants consisted of TSE International, Inc., and Benson Electric. Defendant TSE International, however, was granted summary judgment and all claims against it were dismissed on November 22, 2011. (Doc. 63.)

2

83 at 8; Dehring Dep., Doc. 83, Attach. 4 at 46.) Plaintiff testified at his deposition that, before leaving the pilot house, First Mate Bautzmann asked Captain Wolfe whether additional crew members should be dispatched to coordinate the temporary tie-up and Captain Wolfe responded, "no." (Doc. 83 at 9; Dehring Dep. at 51.) The vessel remained in temporary tie-up for 27 minutes. (Doc. 83 at 9.) At approximately 5:38 a.m., the vessel released its cables and proceeded toward the entry to the Lock. (*Id.*) Plaintiff was working alone and was responsible for running the forward winch controls, re-rigging cables number one and two to prepare for entry into the lock chamber, and for calling the distance of the vessel as it proceeded into the Lock. (*Id.*) The aft winch controls and lines were handled by the Bosun, Brian Peacock, and the aft distance calling was done by Second Mate Rosenfeld. (*Id.*)

Just prior to his injury, Plaintiff was standing on a small platform in front of the forward starboard winch controls number one and two, which stood approximately one foot from the deck surface. (*Id.*) The Callaway's usual procedure in preparing the cables from the forward winch was to bring the eye of the cable up over a ladder roller affixed to the vessel (since approximately 1982) for easy access. (Doc. 80 at 12.) Since the ladder roller was positioned directly above the winch controls, a crew member was required to stand on a platform between the two forward chocks and reach over the controls to place the number one cable in its standard mooring position. (*See* Doc. 83 at 10; Ex. B.) A metal cover could be flipped down to cover the controls and prevent inadvertent engagement.

Plaintiff brought in the number two cable and then began bringing in the number one cable, intending on leaving 15 feet of slack over the side of the vessel and looping it over the ladder roller. During this process, cable one slid into a gap between the edge of the roller and ladder guide on the forward (left) side of the ladder roller. (Doc. 83 at 9-10; Ex. C.) The metal cover had not

been flipped down, and as Plaintiff attempted to free the line, the winch controls inadvertently moved from the stop to the heave position.[3] Plaintiff could not hear that the winch, which was located behind him, was in operation because of the noise in the area. In addition, Plaintiff was required to call distances whenever asked by using a walkie talkie that required one hand to depress the button to communicate with the pilot house. (Doc. 83 at 10; Dehring Dep. at 56, 86.) Thus, cable one began moving while Plaintiff was holding it with his right hand, causing his right thumb to be pinched in between the cable and the roller. (Doc. 80 at 12; Ex. 1 at 56.) As Plaintiff reached his left hand around to try and free his right hand, his left thumb was also pinched. (Doc. 80 at 12; Ex. 1 at 57.) Both of Plaintiff's thumbs were pulverized. (*Id.*) After being transported to the University of Michigan hospital, Plaintiff underwent a nine-and-a-half-hour surgery removing the second digit of his left foot to be transplanted to replace his right thumb. (Doc. 83 at 11.)

## B.    Summary Judgment Standards

A motion for summary judgment will be granted under Rule 56(c) where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's

---

[3]The winch assists in locking and docking the vessel by "paying out" or "heaving in" cable to secure the vessel while docked.

4

evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

However, when "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary

materials to establish all of the elements of the claim or defense." *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997). *See also Yarbrough v. Garrett*, 579 F. Supp. 2d 856, 867 (E.D. Mich. 2008). "'In other words, in such case the movant 'must satisfy both the initial burden of production on the summary judgment motion – by showing that no genuine dispute exists as to any material fact – and the ultimate burden of persuasion on the claim – by showing that it would be entitled to a directed verdict at trial.'" *Yarbrough*, 579 F. Supp. 2d at 867 (citations omitted). Only after the moving party makes this showing will the non-moving party have an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore, supra.*

### C.     Products Liability Claims

### 1.     Arguments of the Parties

Before the Court are Defendant Benson and Plaintiff's cross-motions for summary judgment on the products liability claims. Defendant Benson contends that it is entitled to summary judgment for the following reasons: (1) Plaintiff's misuse of the winch was not foreseeable and bars his recovery (Doc. 80 at 14-18); (2) proposed alternative designs of the winch, i.e., the addition of a warning light, placement of the winch at a different location aboard the ship, or reconfiguring the winch levers into a parallel orientation, would not have prevented his injury (*id*. at 18-22); (3) Plaintiff cannot show that the winch's design violated any industry or government standards at the time it was manufactured in 1952. (*Id*. at 22-24.)

Plaintiff responds in opposition to the motion, asserting: (1) that he did not misuse the winch; (2) that an alternative design of the winch would have prevented his injuries (such as a warning light, a sign stating that the winch control lid should be closed when not in use, or placement of the control levers parallel with the deck rail rather than perpendicular), as testified

to by Plaintiff's expert Bartley Eckhardt; (3) that Benson had a duty to warn and a continuing duty to make alterations or otherwise recommend relocation of the winch handles; and (4) that Benson violated industry and governmental standards. (Doc. 88 at 3, 17-21.) Plaintiff contends that Defendant Benson, "as the designer and manufacturer of the winch controls," was negligent and breached its duty of care by failing to (1) provide adequate warnings, installation instructions, or other safety measures so as to eliminate the risk of crew-member injury, (2) prepare and inspect their products so as to ensure that they are reasonably fit for their intended use, and (3) accurately label and give adequate warnings and instructions regarding use of the product. (Doc. 83 at 2.) Plaintiff also contends that Defendant Benson is liable (1) for design defect of its winch, which was not equipped with appropriate safety measures; (2) on a theory of strict liability as described in Section 402(a) of the Restatement of Torts; (3) for failing to satisfy their continuing duty to recommend alterations or reconfigurations of its winch controls; and (4) for failing to satisfy their continuing duty to warn while having the knowledge that the practice aboard the Cason J. Callaway rendered their winch unsafe, especially where Defendant Benson continued to service the winch and should have known of the unreasonably dangerous condition. (*Id*. at 2-3.)

Defendant Benson argues that it cannot be held liable under negligent design or manufacture theories "when Plaintiff misused the winch controls, when Defendant did not design the winch that Plaintiff was injured on or the placement of the winch controls aboard the vessel, when no industry standard was in place at the time the winch was manufactured and when there is no continuing duty for Benson to warn or re-design the winch controls or their placement on the vessel." (Doc. 85 at 4.)

### 2. Governing Law

Defendant Benson cites to Michigan law regarding products liability and notes that Plaintiff contends "that Michigan's risk-utility test should not be applied" and that Michigan has not adopted the Restatement (Third) of Torts. (Doc. 89 at 3 n.5.) Defendant Benson also notes that the Restatement (Third) of Torts applies a risk-utility test that is similar to Michigan's test and that the Restatement (Second) of Torts should be applied. (*Id.*) Defendant Benson relies on Michigan law and the Restatement (Third) of Torts for the argument that Plaintiff's "misuse of the winch was not reasonably foreseeable to Benson at the time of the manufacture." (*Id.*)

At least one Michigan Court of Appeals panel has recognized and applied the "current" Restatement of Torts, which is the Third. *See Bell v. Ren-Pharm, Inc.*, 713 NW. 2d 285, 288 (Mich. Ct. App. 2006).

Under the Restatement (Third) of Torts, a product "is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings." Restatement (Third) of Torts: Prods. Liab. § 2 (1998). The restatement then explains that a product:

> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

> (c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution and the omission of the instructions or warnings renders the product not reasonably safe.

*Id*. The third restatement, rather than the second, generally guides maritime law cases. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011); *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1190 n.18 (11th Cir. 2009); *Krummel v.Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000); *Briley v. U.S. United Barge Line, LLC*, No. 5:10-CV-00046-R, 2012 WL 2344460, at *12 n.3 (W.D. Ky. June 20, 2012).

Since both the second and third restatements focus on whether the design is reasonable and whether the proposed alternative design was available, feasible, and could have been reasonably adopted to lessen any danger associated with the product, I suggest that resolution of the products liability issues would be the same under either the second or third restatement, as discussed below, and, thus, that this issue is not dispositive.

### 3.    Negligent Design

### a.    Standards

"To establish a prima facie case of negligence, a plaintiff must prove: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, (3) the defendant's breach caused the plaintiff's injuries, and (4) the plaintiff suffered damages." *Kosmalski v. St. John's Lutheran Church*, 680 N.W.2d 50, 53 (Mich. Ct. App. 2004). Under the specific products liability theory of design defect, a plaintiff must show that: (1) the product was not reasonably safe when it left the control of the manufacturer and (2) a feasible alternative design was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to its users. Mich. Comp. Laws § 600.2946(2); *Gregory v. Cincinnati, Inc.*, 538 N.W.2d 325, 329 (Mich. 1995).

The Sixth Circuit has interpreted Michigan law to require a plaintiff to demonstrate the following criteria in order to establish a prima facie case of design defect, known as the risk-utility

balancing test: (1) that the severity of the injury was foreseeable by the manufacturer; (2) that the likelihood of occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product; (3) that there was a reasonable alternative design available; (4) that the available alternative design was practicable; (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the product; and (6) that omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe. *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000).

Under the design defect theory, courts look to the conduct of the manufacturer rather than just the product itself in order to determine whether the design was reasonable under the circumstances. *Id.* Michigan courts also apply a risk-utility test to determine whether a plaintiff has stated a prima facie case of products liability based on a design defect theory. *Prentis v. Yale Mfg. Co.,* 365 N.W.2d 176, 186 (Mich. 1984). The plaintiff's burden to show that the chosen design was unreasonable is a "heavy" one under Michigan law. *Owens v. Allis-Chalmers Corp.*, 326 N.W.2d 372, 379 (Mich. 1982). As one federal court described:

> Under *Owens*, a party would be unable to create a question of fact as to the unreasonableness of a product's design simply by producing a pedigreed expert who would testify that, although it is not in use, he or she has invented a type of "safety device" or an alternative design which would very likely produce a high degree of success in making the product safer. Allowing a plaintiff to present and argue such scant evidence to a jury would violate one of the fundamental precepts of *Owens* by leading the trier of fact into a "web" from which no principled decision would be possible. Thus, in a case where the magnitude of the risks is uncertain – and the proposed alternative design is not in use – the mere assertion by an expert that a proposed alternative would have been "safer" is insufficient to create a question of fact as to whether the chosen design was "defective." A plaintiff who proffers an alternative design that is not currently in use must do significantly more to make out a prima facie case under the heavy burden standard of *Owens*. . . .
>
> To satisfy the "heavy burden" created by *Owens* under such circumstances, this Court holds that it is incumbent upon a plaintiff to make a showing – via

compelling, empirical evidence of an alternative design – that the chosen design was unreasonably dangerous. Such empirical evidence will probably most often take the form of testing, but must objectively show acceptability, utility, feasibility (including cost), and general safety of the proposed alternative design vis-a-vis the allegedly defective design. It is only with the assistance of such evidence on the proposed alternative design that the trier of fact can make a sound determination as to whether the manufacturer exercised reasonable care in making the design choices it made.

*Fisher v. Kawasaki Heavy Indus., Ltd*, 854 F. Supp. 467, 471 (E.D. Mich. 1994) (citations omitted).

Finally, plaintiff must show that the manufacturer's negligence was the proximate cause of plaintiff's injuries as part of his prima facie case. *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994). A plaintiff must therefore show cause in fact, i.e., that but for the defendant's actions, the plaintiff's injury would not have occurred, and legal or proximate cause. *Id.* "Proximate cause means such cause as operates to produce particular consequences without the intervention of any independent, unforeseen cause, without which the injuries would not have occurred." *Babula v. Robertson*, 536 N.W.2d 834, 839 (Mich. Ct. App. 1995). Stated differently, proximate cause is "'a foreseeable, natural, and probable' cause of 'plaintiff's injury and damages.'" *Kaiser v. Allen*, 746 N.W.2d 92, 95 (Mich. 2008) (citations omitted). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation . . . . Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory." *Skinner*, 516 N.W.2d at 480.

### b.   Evidence Presented

Defendant Benson proffers the deposition testimony of crew member Craig Collins who stated that there was no place an indicator light could be placed that would have, under the circumstances, caught Plaintiff's attention and revealed that the winch controls had been turned on when Plaintiff leaned forward to free the lines in the process activating the winch controls. (Doc. 80 at 19, Ex. 1.) In addition, Defendant Benson refers to the testimony of Craig Collins, Brian

11

Peacock, and Captain Wolfe, all of whom testified that the cover should have been lowered over the winch controls when Plaintiff was performing his duties. (Doc. 80 at 17, Exs. 5, 7, 11.)

Plaintiff disagrees, proffering the deposition testimony of Captain Wolfe who stated that it was foreseeable that the winch control could be inadvertently activated while a crew member's attention was diverted and the Shipowner's Safe Job procedure for use of electric mooring winch operation. (Doc. 83 at 10, 12; Wolfe at 94-95.) Plaintiff also proffers the expert testimony of Captain Nicholas Lewis, who states that the defendants did not comply with international accident prevention standards for mooring and unmooring. (Doc. 83 at 13, Ex. G.) In addition, Plaintiff offers Captain Wolfe's testimony for the proposition that an indicator light could have been installed above the winch controls that would have illuminated when the controls were activated. (Doc. 83 at 13-14.) Plaintiff also cites the testimony of crew members Collins and Peacock who testified that these indicator lights were used on another vessel in the fleet, i.e., the John G. Munson. (Doc. 83 at 14; Peacock Dep. at 35; Collins Dep. at 52.)

Plaintiff also proffers the testimony of Eugene Booker, an employee of Defendant Benson, who had visited the vessel and had warned the shipowner that the ladder roller could interfere with the winch operator's view of the deckhands or that cables could get stuck on the roller. (Doc. 83 at 14; Booker Dep. at 5, 51, 52.) Booker's testimony was also offered to show that it would have been possible to reconfigure the controls such that heave mode would be achieved by pushing to the right rather than to the left. (Doc. 83 at 16.)

Plaintiff also offers crew member testimony indicating that although the winch controls had a "bread box cover on a hinge," the cover was used not as a safety device but rather to protect the controls from weather, along with testimony from Captain Lewis that the cover was not closed during the temporary tie-up mooring procedures undertaken that morning by Plaintiff. (Doc. 83 at

12

16-17; Lewis Dep. at 22-24; Bautzmann Dep. at 66, 69; Booker Dep. at 66.) Plaintiff added that the cover is only closed after docking and locking procedures are completed, not during the process of rigging the lines. (Doc. 83 at 17; Dehring Dep. at 61.) In addition, Brian Peacock testified that Plaintiff may not have had time to close the cover under the circumstances he faced that morning. (Doc. 83 at 16; Peacock Dep. at 55.) Finally, Plaintiff offers the first mate's testimony that "the operation would have been different I think if you had two down there." (Doc. 83 at 17; Bautzmann Dep. at 53.)

Finally, Plaintiff proffers the expert witness testimony of Bartley Eckhardt that "no attempt was made by Benson Company to design its winch controls pursuant to" the "ASTM standards that have been in effect since 1988." (Doc. 83 at 26, Ex. 5.) Eckhardt testified that he has never designed a winch control system, nor has he ever been paid to examine a system and critique the design. (Doc. 83, Ex. 5 at 2.) Eckhardt conceded that he had "no evidence" that there was any malfunction and he opined that "it's more likely that [Plaintiff] contacted the winch control inadvertently because of the terrible arrangement of this ladder roller assembly and its proximity to the winch control." (*Id.* at 2-3.) Eckhardt explained that a "safer design" would have been to configure the controls differently, i.e., "if the handles were opposite hand and oriented fore and aft, instead of fore ship, then it's much more difficult, and, in fact, in my opinion, impossible to inadvertently contact those control handles while on the – while operating the platform . . . because those handles are now protected by the body of the . . . deck edge control station . . . [and] if you lean outboard at that point, you're leaning into the body of the control station and not into the handle." (*Id.* at 8.)

Eckhardt also indicated that it would have been safer to place a warning light within the winch operator's peripheral vision, such as "in the support structure underneath the ladder roller"

13

or to "have some type of rotating beacon or strobe just forward under the weather deck extension." (*Id.* at 6.) Eckhardt agreed with counsel's summary that he opined that the winch controls should have been relocated on the vessel or the ladder roller should have been eliminated from use, that the handles should have been designed to face fore and aft, and that there should have been a warning light that some dangerous motion was about to occur. (*Id.* at 9.)

On cross-examination, counsel asked whether Eckhardt was aware that "Benson designed the control panel only and shipped it to the ship, [and] someone else then configured it and designed where it would be placed on the ship," to which Eckhardt responded that he "didn't know that." (*Id.* at 10.) Eckhardt added that "[i]f Benson supplied it, I would be surprised if they were not involved in the start-up at that time. But I don't have evidence one way or the other." (*Id.*)

  **c.**  **Application and Analysis**

I first suggest that the alternative "designs" advocated by Bartley Eckhardt are largely not alternative designs of the winch controls but rather alternatives for placement or location of the winch controls or the addition of a warning light somewhere on the vessel and in view of the operator which would indicate when the winch was about to be set in motion. (Doc. 83, Ex. 5 at 9.) I further suggest that the only theory posed by Eckhardt that concerns the design of the actual winch controls themselves is the theory that the handles should have been oriented fore and aft, instead of fore ship. (*Id.* at 8-9.) I note that the different orientation could have been accomplished by relocating or repositioning the winch controls as well as by an alternative design of the controls.

Even assuming, however, that the orientation of the handles is part of the design of the winch controls, I suggest that Plaintiff has failed to provide any evidence that this alternative orientation design was in use and, thus, he faces the heavy burden set forth in *Owens*. Therefore, I suggest that Plaintiff has not made the requisite showing "via compelling, empirical evidence of

14

an alternative design – that the chosen design was unreasonably dangerous." *Fisher*, 854 F. Supp. at 471.

Likewise, Plaintiff has neither proffered evidence of the likelihood of this type of injury occurring due to the current design nor produced evidence regarding the feasibility of the alternative design, e.g., production cost estimates. I therefore suggest that Defendant Benson is entitled to summary judgment on Plaintiff's products liability negligent design claim. *See Fisher,* 854 F. Supp. at 471 (granting summary judgment on design defect claim where the plaintiff's expert described the alternative design but did not address how practicable the manufacture of these designs would be, nor did he discuss estimated costs of production or any other evidence regarding the feasibility of the alternative designs); *Hammons v. Icon Health and Fitness*, 616 F. Supp. 2d 674, 681 (E.D. Mich. 2009) (granting summary judgment because the plaintiff failed to meet the heightened burden set forth in *Owens* where  there was no evidence of past similar incidents and where the expert did not present data or factual evidence of the foreseeability of children starting the machine and becoming trapped and injured in spite of the safety mechanisms and warnings and where the expert acknowledged that the design accounts for the foreseeable risk of inadvertent starts of the treadmill); *Estate of Lakey v. Kia Motors America, Inc.*, No. 08-12031, 2009 WL 2448570, at *5 (E.D. Mich. Aug. 10, 2009) (granting summary judgment where "[e]ven if the Court were to assume that plaintiff adequately addressed the magnitude-of-risk factor [by expert testimony regarding alternative design,] . . . Plaintiff has provided no evidence or analysis that her proffered design is feasible, cost-effective, safe, or reasonable"); *Strauch v. Raymond Corp.*, No. 254224, 2005 WL 3556107, at *2 (Mich. Ct. App. Dec. 29, 2005) (affirming grant of summary disposition on design defect claim where the plaintiff's expert failed to provide any data regarding how often the type of injury occurred and where he failed to demonstrate that any of his suggested

alternatives would either be safer than the original design or that they would not significantly impair the usefulness or desirability of the forklift to its users); *Gillette v. Sofamor, S.N.C.*, No. 96-75541, 2001 WL 1135304, at *5 (E.D. Mich. Sept. 13, 2001) (granting summary judgment for the defendant where the plaintiff's expert testified that an alternatively designed nitrogen-ion-treated bone screw would likely be harder and less susceptible to cracking, but where the expert did not test the screw in living tissue and did not present any evidence regarding the acceptability, utility, feasibility, or general safety of the nitrogen-ion-treated bone screw).

### 4. Failure to Warn

### a. Standards

Under Michigan law, a manufacturer has a duty to warn of dangers associated with the intended use or reasonably foreseeable misuse of the product. *Portelli v. I.R. Constr. Prods. Co.*, 554 N.W.2d 591, 596 (Mich. Ct. App. 1996); *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 618 (6th Cir. 2001). In order to succeed on a claim for failure to warn under Michigan law, a plaintiff must show that the seller or manufacturer: (1) had actual or constructive knowledge of the alleged danger; (2) had no reason to believe that consumers would not know of this danger; and (3) failed to exercise reasonable care to inform consumers of the danger. *Hollister*, 201 F.3d at 741. A plaintiff must also establish causation and damages. *Fisher*, 854 F. Supp. at 472.

"Under the plain language of MCL 600.2948(2), a manufacturer has no duty to warn of a material risk associated with the use of a product if the risk: (1) is obvious, or should be obvious, to a reasonably prudent product user, or (2) is or should be a matter of common knowledge to a person in the same or similar position as the person upon whose injury or death the claim is based." *Greene v. A.P. Products, Ltd.*, 717 N.W.2d 855, 860 (Mich. 2006). This objective standard "is consistent with this Court's case law predating the statute." *Id.* n.10. The *Greene* court concluded

16

that where the plaintiff's son consumed a haircare product that clearly indicated that it was for use on hair and the body and was not marketed as safe for human consumption, the defendants had no duty to warn the plaintiff that her son's ingestion posed a material risk. *Id.* at 861. The court noted that "the statute does not require that a warning address possible injuries that might occur." *Id.* at 860.

While product "[m]anufacturers have a duty to warn purchasers or users of dangers associated with the intended use or reasonably foreseeable misuse of their products...the scope of the duty is not unlimited." *Glittenberg v. Doughboy Recreational Ind. (on Rehearing)*, 441 Mich. 379, 387-88, 491 N.W.2d 208 (1992). One of those limits is the sophisticated user doctrine which presumes that "where a purchaser is the 'sophisticated user' of a manufacturer's product, the purchaser is in the best position warn the ultimate user of the dangers associated with the product, thereby relieving the sellers and manufacturers from the duty to warn the ultimate user." *Portelli*, 554 N.W.2d at 596.

The Sixth Circuit has "agree[d] with virtually every Michigan court which has opined on the matter, all of which have suggested that the obviousness of a danger is merely one factor in the analysis of whether the risks are unreasonable in light of the foreseeable injuries" in a "defective design" case. *Swix v. Daisy Manufacturing Co., Inc.* 373 F.3d 678, 682 (6th Cir. 2004). On the other hand, in a case based upon an alleged failure to warn, "there is no need to warn of a danger where the danger is obvious, but in a design defect case, the court must also consider whether a manufacturer should have created the danger in the first place." *Id.* at 683. "For instance, the danger associated with a rag-doll with steak knives for arms ('Steak Knife Sally') may be quite obvious, but it is equally clear that the risks associated with such a design outweigh the utility." *Id.*

17

"In most failure-to-warn cases, proximate cause is not established absent a showing that the plaintiff would have altered his behavior in response to a warning." *Allen v. Owens-Corning Fiberglass Corp.*, 571 N.W.2d 530, 535 (Mich. Ct. App. 1997). Michigan courts have noted that "the only postmanufacture duty imposed on a manufacturer has been the duty to *warn* when the defect existed at the point of manufacture, but for some reason was undiscoverable by both the manufacturer and the consumer at that time." *Gregory v. Cincinnati, Inc.*, 538 N.W.2d 325, 331 (Mich. 1995). The court "emphasize[d] that [it was] not presented with and d[id] not decide whether manufacturers of distinct products have a continuing duty to warn consumers or learned intermediaries of dangers discovered after the product enters the market." *Id.* at 332 n.18. In addition, the court noted that several federal district courts had "rejected the contention that a manufacturer has a duty to notify consumers of postmanufacture safety advances when there is no allegation or proof of a defect existing at the time of manufacture." *Id.* at 332.

**b.    Application and Analysis**

In the instant case, Plaintiff alleges that Defendant Benson was negligent for failing to satisfy its continuing duty to warn, having the knowledge that the practice aboard the Cason J. Callaway rendered its winch unsafe, especially where Defendant Benson continued to service the winch and should have known of the unreasonably dangerous condition. (Doc. 83 at 2-3.)

To the extent that Plaintiff has argued that Defendant Benson should have included a warning on the winch controls itself, I suggest that the Shipowner/Operator Defendants who purchased the winch controls were sophisticated users who were "in the best position warn the ultimate user of the dangers associated with the product, thereby relieving the sellers and manufacturers from the duty to warn the ultimate user." *Portelli,* 554 N.W.2d at 596. I further

suggest that the danger of winch controls starting movement of a winch is an open and obvious danger for which a warning would be superfluous. *See Swix,* 373 F.3d at 682.

As to Plaintiff's articulated theory that Defendant Benson failed to satisfy its continuing duty to warn because its servicemen were aware of the dangerous practice aboard the Callaway (Doc. 83 at 2-3), I suggest that Plaintiff's argument fails since he has not offered evidence that he would have changed his behavior in response to any warning, i.e., that he would have lowered the cover on the winch controls. *See Allen*, 571 N.W.2d at 535.

More fundamentally, Plaintiff has not alleged a situation where the "defect existed at the point of manufacture, but for some reason was undiscoverable by both the manufacturer and the consumer at that time." *Gregory,* 538 N.W.2d at 331. Michigan has not yet recognized any continuing duty to warn consumers of dangers discovered after the product enters the market and federal courts applying Michigan law have "rejected the contention that a manufacturer has a duty to notify consumers of postmanufacture safety advances when there is no allegation or proof of a defect existing at the time of manufacture." *Id.* at 332. I therefore suggest that Plaintiff has failed to state and support a claim under a products liability failure-to-warn theory and that summary judgment should be granted in favor of Defendant Benson as to this claim.

### 5.      Strict Liability

"Michigan does not recognize strict liability as a theory of recovery in products liability actions." *Rodger v. Ford Motor Co.*, No. 275578, 2008 WL 4646140, at *6 (Mich. Ct. App. Oct. 21, 2008) (citing cases). I therefore suggest that Defendant Benson is entitled to summary judgment as to Plaintiff's strict liability claim.

### 6.      Conclusion

19

For all these reasons, I suggest that Defendant Benson's motion for summary judgment be granted.

**D.      Jones Act and Unseaworthiness Claims**

**1.      Arguments of the Parties**

In his motion for partial summary judgment, Plaintiff contends under admiralty law principles that the Shipowner/Operator Defendants were negligent as a matter of law for failure to provide Plaintiff with a safe place to work, failure to inspect the vessel for hazards, and breach of the duty of care to provide and conduct adequate training, supervision of its crew, and adequate warnings regarding mooring/winch operations. (Doc. 83 at 1-2.) The Shipowner/Operator Defendants respond that since there is evidence that Plaintiff was himself negligent, there is a genuine issue of material fact requiring a jury determination of the percentage of fault to be attributed to the parties. (Doc. 86.) Defendants[4] rely on Plaintiff's own deposition testimony that he did not seek assistance from another person and that the lid covering the control system of the winch was open at all relevant times. (Doc. 86 at 7.) Defendants refer to the lid as a "safety mechanism that is located on the winch control." (*Id.*)

**2.      Jones Act**

**a.      Standards**

The Jones Act provides in pertinent part that a "seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104 (amend. 2006). The statute goes on to provide that the "[l]aws of the United States regulating

_____

[4]Hereafter, "Defendants" will refer to the Shipowner/Operator Defendants.

20

recovery for personal injury to, or death of, a railway employee apply to an action under this section." *Id.*[5]

The Jones Act allows a seaman to bring claims for personal injury suffered in the course of employment that were caused by his employer's negligence. In a Jones Act negligence action, the duty element is the employer's duty to provide a safe workplace for its employees. *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 907 (6th Cir. 2006). If a plaintiff establishes that the employer breached that duty, the Jones Act relieves the plaintiff from having to prove proximate cause, as one would be required to do in a standard negligence claim. Instead, "[u]nder the Jones Act, a plaintiff need only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries." *Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1463 (6th Cir. 1993) (citing *Gosnell v. Sea-Land Service, Inc.*, 782 F.2d 464, 467 (4th Cir. 1986)). The plaintiff "must produce some evidence of negligence" because "[t]he mere fact of injury is not sufficient." *Rutherford v. Lake Mich. Contractors, Inc.*, 28 F. App'x 395, 400 (6th Cir. 2002). If a plaintiff's "negligence is the sole cause of his injuries," he cannot recover. *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001); *Hughlett v. Oglebay Norton Marine Servs. Co., LLC*, No. 1:04 CV 01821, 2007 WL 781327, at *2 (N.D. Ohio Mar. 12, 2007) (granting summary judgment because the plaintiff's negligence was the sole cause of his

---

[5]The statute applying to railway employees is the Federal Employers' Liability Act ("FELA"), which provides in pertinent part:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.

injury where he pulled hard on a mooring cable knowing there was insufficient slack, despite plaintiff's contention that the winch operator should have watched him rather than the winch).

> In sum, to survive summary judgment in this [Jones Act] action, [the plaintiff] had to create a genuine issue of material fact regarding whether (1) she was a seaman; (2) she was acting in the course of her employment at the time she suffered her injury; and (3) [defendant] or its agents played any part in causing [the plaintiff's] injury.

*Rannals v. Diamond Jo Casino*, 265 F.3d 442, 448 (6th Cir. 2001). The reasonable person standard applies to plaintiffs in Jones Act negligence cases; thus, although "a seaman may not be obligated to find the safest method of performance . . . he has a duty to exercise the judgment and acumen of a seaman with like experience in like circumstances." *Pallis v. United States*, 369 F. App'x 538, 542 (5th Cir. 2010).

"Maritime law espouses a system of comparative negligence" such that the "doctrine of contributory negligence . . . does not preclude a plaintiff from complete recovery on unseaworthiness or Jones Act claims." *Churchwell*, 444 F.3d at 908. Similarly, the assumption-of-risk defense does not apply to either unseaworthiness or Jones Act maritime actions. *Id.* at 909. However, the "sophisticated user" defense is recognized under maritime law. *Mack v. General Electric Co.*, ___ F. Supp. 2d ___, 2012 WL 471918, at *7 (E.D. Pa. Oct. 3, 2012). To utilize this defense, a defendant must show that the plaintiff injured by the product was an "end user who either knew or belonged to a class of users who, by virtue of training, education, or employment could reasonably be expected to know of the hazards of the product at issue." *Id.* at *8.

"Under the Jones Act, a plaintiff need only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries." *Miller*, 989 F.2d at 1463. However, "[a]n injury alone does not create Jones Act liability; the plaintiff must show that the employer's conduct fell below the required standard of care." *Schouweiler v. Western Towboat Co.*,

No. C05-502Z, 2007 WL 4410252 (W.D. Wash. Dec. 14, 2007) (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997)). "[T]he phrase 'in whole or in part' as set forth in the statute, or, as it has come to be known, 'slightest,' modifies only the causation prong of the inquiry. The phrase does not also modify the word 'negligence.' The duty of care owed, therefore, . . . retains the usual and familiar definition . . . ." *Gautreaux*, 107 F.3d at 335. *Accord Crawford v. Falcon Drilling Co.*, *Inc.*, 131 F.3d 1120, 1125 (5th Cir. 1997); *but see Williams v. The Long Island R.R. Co.*, 196 F.3d 402 (2d Cir. 1999) (the Second Circuit applies a relaxed standard for negligence as well as causation under FELA).

In addition, under the Jones Act, an employer has a duty to effectively warn employees of dangers not reasonably known; however, "shipowners need not warn seamen of dangers that are 'open and obvious.'" *Patterson v. Allseas USA, Inc.*, 137 F. App'x 633, 637 (5th Cir. 2005).

### b.    Evidence Presented

Plaintiff proffers the deposition testimony of Captain Wolfe who stated that it was foreseeable that the winch control could be inadvertently activated while a crew member's attention was diverted. (Doc. 83 at 10, 12; Wolfe Dep. at 94-95.) Plaintiff also proffers the expert testimony of Captain Nicholas Lewis who stated that Defendants did not comply with international accident prevention standards for mooring and unmooring. (Doc. 83 at 13, Ex. G.) In addition, Plaintiff offers Captain Wolfe's testimony for the proposition that an indicator light could have been installed above the winch controls that would have lit up when the controls were activated. (Doc. 83 at 13-14.) Crew members Collins and Peacock testified that these indicator lights were used on another vessel in the fleet, i.e., the John G. Munson. (Doc. 83 at 14; Peacock Dep. at 35; Collins Dep. at 52.) Plaintiff's expert, Bartley Eckhardt, also indicated that it would have been safer to place a warning light within the winch operator's peripheral vision, such as "in the support

structure underneath the ladder roller" or to "have some type of rotating beacon or strobe just forward under the weather deck extension." (Doc. 83, Ex. 5 at 6.)

Plaintiff also proffers the testimony of Eugene Booker, an employee of Defendant Benson, who visited the vessel and testified that he had warned the shipowner that the ladder roller could interfere with the winch operator's view of the deckhands or that cables could get stuck on the roller. (Doc. 83 at 14; Booker Dep. at 5, 51, 52.) Booker's testimony was also offered to show that it would have been possible to reconfigure the controls such that heave mode would be achieved by pushing to the right rather than the left. (Doc. 83 at 16.)

Plaintiff also offers crew member testimony indicating that although the winch controls had a "bread box cover on a hinge," they were used not as a safety device but rather to protect the controls from weather as well as testimony from Captain Lewis that the covers were not closed during the temporary tie-up mooring procedures done in the instant case. (Doc. 83 at 16-17; Lewis Dep. at 22-24; Bautzmann Dep. at 66, 69; Booker Dep. at 66.) Plaintiff added that the cover is only closed after docking and locking procedures are completed, not during the process of rigging the lines. (Doc. 83 at 17; Dehring Dep. at 61.) In addition, Brian Peacock testified that Plaintiff may not have had time to close the cover under the instant circumstances. (Doc. 83 at 16; Peacock Dep. at 55.) Finally, Plaintiff offers the first mate's testimony that "the operation would have been different I think if you had two down there." (Doc. 83 at 17; Bautzmann at 53.)

Defendants respond that since there is evidence that Plaintiff was negligent, there is a genuine issue of material fact that must be presented to the trier of fact for apportionment of fault. (Doc. 86 at 5.) Defendants proffer testimony from Captain Wolfe, Brian Peacock, and deckhand Craig Collins that Plaintiff did not lower the lid that covers the controls. (Doc. 86 at 10-15, Ex. A at 60-61, 120, 122; Ex. B at 31, 49-50, 56-57, 87-89; Ex. C at 38-41, 44-45, 57-58; Ex. D at 18, 48,

60.) Collins testified that he would close the lid over the controls while performing the same job Plaintiff was performing when injured. (Doc. 86 at 15, Ex. D.) Peacock testified that Defendants taught him that while pulling cable over the roller as Plaintiff was, he should close the lid on the winch controls, that he does indeed close the lid when working with the cables, and that if he ever saw anyone placing cables over the roller without closing the cover on the winch controls, he would tell the person to close the lid. (Doc. 86 at 14, Ex. C.) Captain Wolfe testified that the "number one problem is that [Plaintiff] didn't make sure" that the "winch control guard" cover was closed because "that's the safety device to lock the winch from operating." (Doc. 86 at 11-12, Ex. B.) In addition, Captain Wolfe testified that Plaintiff should have asked for help to pull in the lines and that, when the cable got stuck, Plaintiff "should have asked for help." (Doc. 86 at 12-13, Ex. B.)

### c.   Conclusion

After review of the record evidence, I suggest that Defendants have met their burden to come forward with sufficient evidence to establish a genuine issue of material fact as to whether Plaintiff's negligence caused Plaintiff's injuries. I therefore suggest that Plaintiff's motion for summary judgment on the Jones Act claim of negligence be denied. *See Carney v. United States*, 598 F. Supp. 2d 715, 720 (D. Md. 2009) (after trial, court found defendant negligent and vessel unseaworthy where fan lacked a protective guard and where it had a capacity to freewheel, had freewheeled in the past, and where the plaintiff was not warned of the fan's freewheeling potential); *Spencer v. Sea-land Service, Inc.*, No. 98CIV2817, 1999 WL 325528, at *1 (S.D.N.Y. May 21, 1999) (denying summary judgment where the plaintiff's left leg was struck by a crank that had been inserted into a gangway winch where the plaintiff contended insertion of the crank was negligent when not limited to manual operation of the winch); *Michael v. North American Fish Co.*, No. C-94-1092-SI, 1996 WL 371422, at *4 (N.D. Cal. June 21, 1996) (after trial, court found mere

configuration of fixed access ladders on the wheelhouse and the A-frame boom did not render the vessel unseaworthy but that climbing on the winch to access the A-frame boom was unsafe and that the captain of the crew was negligent in failing to instruct the plaintiff not to use that access route to the new boom during its installation phases).

### 3.    Unseaworthiness

Plaintiff also alleges that Defendants' vessel was unseaworthy as a matter of law based on the "officers as well as the equipment including but not limited to the winch controls." (Doc. 83 at 1.) Defendants' response (Doc. 86) does not separately address the unseaworthiness claim but instead relies on arguments made under the negligence claim.

### a.    Standards

An unseaworthiness claim is wholly distinct from a negligence claim under the Jones Act. *Magnussen v. Yak, Inc.*, 73 F.3d 245, 249 (9th Cir. 1996) ("Just as liability for negligence is not limited to unseaworthiness conditions, so acts of negligence do not necessarily constitute unseaworthiness.")

"A ship owner is strictly liable for personal injuries caused by his or her vessel's 'unseaworthiness.'" *Churchwell*, 444 F.3d at 904 (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960)). "Unseaworthiness is a *condition*, and how that condition came into being – where by negligence or otherwise – is quite irrelevant to the owner's liability for personal injuries resulting from it." *Perkins*, 246 F.3d at 602 n.6 (emphasis in original). Even a temporary condition can render a vessel unseaworthy. *Mitchell*, 362 U.S. at 549-50 (ship's rail made slippery by fish gurry). However, an isolated act of negligence of a crew member does not render the vessel unseaworthy. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S. Ct. 514, 27 L. Ed. 2d 562 (1971). "[T]he critical difference between the 'isolated negligence in

*Usner* and the 'temporary condition' in *Mitchell* is that the 'condition' begins as soon as the negligent act ceases[.]" *Shefry v. Barge Marin Horizon*, 76 F. Supp. 2d 1054, 1058 (N.D. Ca. 1999).

A vessel is considered unseaworthy if the vessel and its appurtenances are not "reasonably fit for their intended use." *Mitchell*, 362 U.S. at 550. To prove a claim of unseaworthiness, a plaintiff must show (1) that the scope of the warranty of unseaworthiness extends to him and his duties; (2) that the injury was caused by a piece of the ship's equipment or appurtenant appliances; (3) that the equipment was not reasonably fit for its intended use; and (4) that the unseaworthy condition was a proximate cause of the plaintiff's injuries. *Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1310-13 (9th Cir. 1970). To show that the unseaworthiness of the vessel proximately caused his injuries, a plaintiff must prove that unseaworthiness "played a substantial part in bringing about or actually causing the injury and the injury was either a direct result or a reasonably probable consequence of unseaworthiness." *Miller*, 989 F.2d at 1463-64 (citations omitted).

Unseaworthiness can arise from defective gear, an unfit or understaffed crew, use of an improper method of storing or unloading cargo, or misuse of properly-functioning equipment when so directed by a superior. *Churchwell*, 444 F.3d at 904. "A finding that the boatswain and/or the crew was inadequate or ill-trained for the task they were assigned represents a classic example of unseaworthiness." *Bonefront v. Valdez Tankships Corp.*, 136 F.3d 137, 1998 WL 30028, at *5 (5th Cir. 1998). In addition, utilizing "an unsafe method of work may render a vessel unseaworthy[.]" *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985). Finally, the existence of a safe alternative that the plaintiff failed to use does not bar an unseaworthiness claim. Its existence may be used by a factfinder to lessen the liability of the shipowner and reduce the amount

of damages. *Torres Vasquez v. Commercial Union Ins. Co.*, 367 F. Supp. 2d 231, 236 (D. Puerto Rico 2005).

     **b.**     **Evidence Presented**

In the instant case, Plaintiff's claim is based on the "officers as well as the equipment including but not limited to the winch controls." (Doc. 83 at 1.) There is some evidence proffered tending to show unseaworthiness due to an inadequate number of crew members at the time of Plaintiff's injury, i.e., that Plaintiff's job at the forward winch controls and forward distance calling should have been performed by at least two persons rather than by Plaintiff alone. (Doc. 83 at 17; Bautzmann at 53 ("the operation would have been different I think if you had two down there").) Plaintiff noted that the aft winch controls were manned by two persons and that the aft distance calling was done by a third person. (Doc. 83 at 9.)

In addition, there is evidence supporting the notion that an unsafe method of work was used, i.e., using ladder rollers which could interfere with the winch operator's view of the deckhands or cables that could get stuck on the rollers. (Doc. 83 at 14; Booker Dep. at 5, 51, 52; Doc. 83, Ex. 5 at 2 ("It's more likely that [Plaintiff] contacted the winch control inadvertently because of the terrible arrangement of the ladder roller assembly and its proximity to the winch control.").)

Finally, Plaintiff has proffered evidence of unseaworthiness based on the location of the winch controls, the operating platform, the manner in which the winch controls were aligned in reference to the deck edge, and the lack of a warning light somewhere on the vessel within the peripheral vision of the winch operator. (Doc. 83, Ex. 5 at 6, 8 .)

However, there is also evidence proffered by Defendants that Plaintiff committed an isolated act of negligence by failing to close the lid on the cover of the winch controls, which would not

28

render the vessel unseaworthy. (Doc. 86 at 10-15, Ex. A at 60-61, 120, 122; Ex. B at 31, 49-50, 56-57, 87-89; Ex. C at 38-41, 44-45, 57-58; Ex. D at 18, 48, 60).

### c.    Conclusion

I therefore suggest that there is a genuine issue of material fact, which precludes summary judgment, regarding whether Plaintiff's injuries were caused by isolated negligence or were substantially caused by the condition of the vessel. *See Shefry,* 76 F. Supp. 2d at 1058. Accordingly, I recommend denial of Plaintiff's motion for partial summary judgment with regard to the unseaworthiness claim.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this report and recommendation. *McClanahan v. Commissioner of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2010); *Frontier Ins. Co.,* 454 F.3d at 596-97.


s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER
Dated: December 19, 2012                     United States Magistrate Judge


### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: December 19, 2012                     By     s/Patricia T. Morris
                                            Law Clerk to Magistrate Judge Binder