UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


GREG DEHRING,

                Plaintiff,

v.                                            Case Number 10-cv-13959
                                            Honorable Thomas L. Ludington

KEYSTONE SHIPPING CO., et al.,

                Defendants.

_____/

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION, OVERRULING PLAINTIFF'S OBJECTIONS, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Greg Dehring was an able-bodied seaman working aboard the merchant vessel *Cason J. Callaway* when a winch severed both his thumbs. Plaintiff filed suit against the winch manufacturer and the ship owners. Against the former, Plaintiff alleges products liability; against the latter, unseaworthiness and negligence. The winch manufacturer has moved for summary judgment on the products liability claim. And Plaintiff has moved for partial summary judgment on the unseaworthiness claim.

For the reasons explained below, the manufacturer is entitled to summary judgment; Plaintiff is not. Briefly, the winch manufacturer is entitled to summary judgment because Plaintiff has not demonstrated that the winch was defectively designed. Plaintiff is not entitled to summary judgment because a question of fact exists as to whether he was negligent and, if so, the comparative share of responsibility he bears for the accident.

I

The *Calloway* is a large lake freighter, 767 feet from stem to stern with a 70-foot beam. Built in the middle of the last century, she began sailing in 1952. The winch in question was in operation on the maiden voyage. And, although the winch has received regular maintenance over the past 60-plus years, its design has not changed.

Plaintiff, as noted, was an able-bodied seaman. At the time of the accident, he had more than 20 years' experience working ships on the Great Lakes, including several years aboard the *Calloway*.

A

In the early morning hours of October 18, 2007, the *Callaway* was travelling on the St. Mary's River, bound for Duluth, Minnesota. It approached the Soo Locks. Despite the early hour, other boats were present, and the *Callaway* was forced to tie up and wait for the locks to clear.

Plaintiff was assigned to the forward mooring winch that morning. After deckhands were landed on the pier, he paid out two 7/8 inch steel cable bowlines to them to secure the bow. The bosun and second mate, assigned to the aft winch, secured the stern.

The *Callaway* remained tied up for about a half hour waiting for the locks to clear. When they did, the crew unmoored the ship and it began to make its way towards the locks.

Plaintiff, still manning the forward mooring winch, was responsible for re-rigging the two bowlines to prepare for tying up in the locks.

Engaging the winch, Plaintiff hauled cable two back onboard, looping it over the vessel's handrail and laying the eye on the deck. He then began to use the winch to haul in cable one. Before he finished prepping the line, he would lose both his thumbs.

-2-

B

On the *Callaway*, prepping cable one for mooring has three basic steps.  A sailor first feeds the eye of the line through the chock.  He then pulls the eye over the top of a ladder roller.  And finally he lays the eye on the deck.  This provides about 15 feet of slack in the line, which makes it easier to work with.

The ladder roller is located directly above the winch controls (and about eight feet above the deck).  For the visually inclined:



The winch controls are operated by a lever.  In the off position, the lever is perpendicular to the bulkhead.  Moving the lever clockwise (i.e., to the left) pays out the line.  Moving it counterclockwise (to the right) heaves the line in.  A metal cover is attached to the controls that can be flipped down to prevent inadvertent engagement.  It also protects the controls from the elements.  Again, for the visually inclined:



C

Returning to Plaintiff's actions that morning, after prepping cable two, he used the winch controls to haul in cable one. Drawing the cable back onboard, Plaintiff pulled it up over the ladder roller. He did not close the winch control cover.

As Plaintiff was pulling the cable over the ladder roller, the cable got stuck between the roller and a bracket. Trying to free it, Plaintiff inadvertently bumped the winch controls into the heave position. The winch began hauling in the cable. Plaintiff, however, was still holding it in his right hand. His thumb, caught between the steel of the cable and that of the roller, was pinched, then pulverized.

Scrambling to free his trapped right hand, Plaintiff reached his left hand around, only to have his left thumb caught between the cable and roller. That thumb too was pulverized, then severed. This litigation ensued.

D

Plaintiff filed suit against nine defendants. The four-count complaint asserts: (1) a negligence claim under the Jones Act, 46 U.S.C. § 688 et seq.; (2) an unseaworthiness claim under "General Admiralty and Maritime Law"; (3) a negligent manufacture claim; and (4) a products liability claim pursuant to "Section 402(a) of the Restatement(2d) of Torts." The case was referred to Magistrate Judge Binder for general case management.

The winch's designer and manufacturer, Defendant Benson Electric, filed a motion for summary judgment on the products liability claims. And Plaintiff filed a motion for partial summary judgment on the unseaworthiness claim.

Judge Binder has issued a report recommending that Benson's motion be granted and Plaintiff's motion be denied. Plaintiff objects.

II

The court will make a "de novo determination of those portions of the report . . . to which objection is made." 28 U.S.C. § 636(b)(1). The Court is not obligated to review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

III

A

Plaintiff first objects to the report's application of Michigan tort law. This is error, Plaintiff asserts, because federal admiralty law governs the case. And federal admiralty law, Plaintiff further asserts, applies only the *Restatement (Second) of Torts* — not the *Restatement (Third) of Torts: Product Liability*.

Plaintiff is correct that federal admiralty law governs this case. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (discussing the location and connection test); *see generally* 23 Francis M. Dougherty et al., *Federal Procedure* § 53:4 (2013). The case is before the Court based on admiralty jurisdiction. And "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986).

But Plaintiff errs in asserting that federal admiralty law applies only the product liability rules articulated by the *Restatement (Second)*. *E.g.*, *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 375 (6th Cir. 2001) (discussing *Restatement (Third)* in a federal admiralty case).

Federal courts of appeals, including the Sixth Circuit, also apply the rules articulated by the *Restatement (Third)*. *See id.* (observing that whether a product has been defectively designed or manufactured may be "assessed through the use of risk-utility balancing" test of the *Restatement (Third)*); *see also Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011)

-6-

(collecting admiralty cases and noting that "[s]ince the *Restatement (Third)* was [promulgated] we and other circuits have relied on it").  To understand why, a closer look at both maritime law and products liability law is necessary.

1

Federal admiralty law "is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Transamerica*, 476 U.S. at 864–65; *see generally* Richard Fallon et al., *Hart and Weschsler's The Federal Courts and The Federal System* 655 (6th ed. 2009).

Included in this amalgam is the law of products liability.  *Transamerica*, 476 U.S. at 865–66; *see also Schaeffer v. Mich.-Ohio Nav. Co.*, 416 F.2d 217, 221 (6th Cir. 1969) (concluding that "a products liability claim will lie in admiralty court").  And over the last century that particular body of law has undergone significant modifications.

a

Before 1916, products liability law was "much simpler . . . .  It did not exist."  Douglas Kysar, *The Expectations of Consumers*, 103 Colum. L. Rev. 1700, 1709 (2003) (footnote omitted).  The reason was the common law privity requirement — a manufacturer could be held liable to a direct purchaser, but could not "to a consumer with whom the manufacturer had no direct contractual relationship." *Id.*

Justice Benjamin Cardozo's opinion in *MacPherson v. Buick Motor Co.*, 111 N.E. 1050 (N.Y. 1916) changed this.  Abandoning the common law privity requirement, Justice Cardozo wrote that the time had come to "put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else." *Id.* at 1051.  He reasoned:

-7-

> If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully.

*Id*. Justice Cardozo emphasized that the common law privity requirement "put the source of the obligation where it ought not be. We have put its source in the law." *Id*.

A little less than 50 years later, Justice Roger Traynor located the source of the obligation a little more precisely — in tort. *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 901 (Cal. 1963). Justice Traynor explained:

> [S]trict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law, and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort.

*Id*. (collecting cases).

About this time, the reporter of the *Restatement (Second) of Torts*, Dean William Prosser, was at work drafting what would become § 402A of the *Restatement (Second)*. *See generally* Marshall Shapo, *In Search of the Law of Products Liability: The ALI Restatement Project*, 48 Vand. L. Rev. 631, 636–37 (1995) (providing historical background of § 402A); William Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L. J. 1099 (1960) (anticipating § 402A).

b

The final product of Dean Prosser's efforts, § 402A, was adopted by the American Law Institute in the mid-1960s. It provided: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for

-8-

physical harm thereby caused to the ultimate user." *Restatement (Second) of Torts* § 402A(1) (1965).  And § 402A established "strict liability" — the rule applied although the seller had "exercised all possible care in the preparation and sale of his product."  § 402A(2)(a).

The official comments went on to develop a "consumer expectations" test for whether a product was "unreasonably dangerous."   § 402A cmt. i.  For a product to be unreasonably dangerous, the comments explained, it "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id*.

Section 402A was quickly embraced.  "With a gusto unmatched in the annals of the *Restatements of the Law*, courts and legislatures across the land embraced [it]."  David G. Owen, *Defectiveness Restated: Exploding the "Strict" Products Liability Myth*, 1996 U. Ill. L. Rev. 743, 744 (1996) (footnote omitted).  Indeed, "within a generation the section received nearly unanimous endorsement throughout the United States."  Kysar, *supra*, at 1711.  The unanimous endorsement, however, would not last.

c

One of the principal problems with § 402A was that it "was not written with design defects in mind."   Mary Davis, *Design Defect Liability: In Search of A Standard of Responsibility*, 39 Wayne L. Rev. 1217, 1233 (1993).  As one commentator observes:

> [The drafters of § 402A] intended the Section's strict liability standard, with minor exceptions, to apply *only* to what we now call manufacturing defect cases. Section 402A and its Comments were drafted with little more than manufacturing defect cases in mind.  There was unanimous agreement among the founders that design defect cases were to be controlled by traditional negligence law and that warning and instruction cases were to be controlled by a negligence approach.

George Priest, *Strict Products Liability: The Original Intent*, 10 Cardozo L. Rev. 2301, 2303 (1989) (emphasis in original).

And as applied to design defect claims, the consumer expectations test was "so vague as to be lawless."  Kysar, *supra*, at 1715; *see generally* Davis, *supra*, at 1238 (describing the consumer expectations test as "largely unworkable"); James Henderson & Aaron Twerski, *Drug Designs Are Different*, 111 Yale L.J. 151, 178 (2001) (describing the consumer expectations test as "a vacuous, ersatz test that allows triers of fact to decide [product] design claims on nothing more than a fact-finder's whim").

Illustrating the test's shortcomings is the allegedly defectively designed device here: a lake freighter's winch controls.  What does it mean for such a device to be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer"?  § 402A cmt. i.  What safety features does an ordinary person contemplate that such a device ought to include?  And what criteria are used in making this decision?  The consumer expectations test doesn't answer these questions.

d

Courts, confronted with this analytical void, began devising multi-factor tests to aid the inquiry.  *E.g.*, *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871, 883 (Alaska 1979) ("Because a conclusion of 'defectiveness' represents a determination that the design at issue is 'wrong' in the sense that we will impose legal responsibility for harm caused therefrom . . . the final assessment of 'defectiveness' necessarily implies a weighing of diverse factors related to the product's desirability and to its dangerousness.").

Most involved some form of risk-utility balancing.  *E.g.*, *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y.1983) (defining a "safe product" as "one whose utility outweighs its risks when the product has been designed so that the risks are reduced to the greatest extent possible while retaining the product's inherent usefulness at an acceptable cost").

-10-

And, though many courts continued to reference the "strict liability" of § 402A, in practice they were applying cost-benefit analysis — the foundation of negligence law.  *See generally Shirkey v. Eli Lilly & Co.*, 852 F.2d 227, 232 (7th Cir. 1988) ("Most jurisdictions that have adopted section 402A . . . [are] applying what is effectively a negligence standard . . . in cases nominally controlled by strict liability doctrine.").

e

In the decades following the promulgation  of the *Restatement (Second)*, the risk-utility test's popularity grew, and by the 1980s a consensus had emerged "that the consumer expectations test was both indefensible in theory and unworkable in practice."  Kysar, *supra*, at 1702 (collecting authorities).   In its place, most commentators "advocated the explicit cost-benefit balancing approach of the primary alternative doctrine that courts had developed for determining design defectiveness, the risk-utility test." *Id*.; *see, e.g*., *Burnham v. Sears, Roebuck & Co.*, 856 F.2d 192 (6th Cir. 1988) (applying Michigan's risk-utility test and explaining that "[w]hen a jury decides that the risk of harm outweighs the utility of a particular design (that the product is not as safe as it should be) it is saying that in choosing the particular design and cost tradeoffs, the manufacturer exposed the consumer to greater risk of danger than he should have" (emphasis omitted)); *see also Saratoga Fishing Co. v. Marco Seattle Inc.*, 69 F.3d 1432, 1441 (9th Cir. 1995) (observing in a federal admiralty case that "the risk-utility test provides a superior yardstick of whether a product is unreasonably dangerous or defective"), *rev'd on other grounds sub nom. Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997).

This consensus was not lost on the drafters of the *Restatement*.

-11-

f

In the early 1990s, "the American Law Institute determined that the time had come for the products liability edifice to be reconstructed, and in 1992 it appointed Professors James Henderson and Aaron Twerski as Reporters to perform the task." Owen, *supra*, at, 746 (footnote omitted).

The result was the *Restatement (Third) of Torts: Products Liability*. Completed in 1998, the *Restatement (Third)* expressly adopts risk-utility balancing as the test for design defects. *Restatement (Third)* § 2(b). Section 2(b) provides a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller." *Id*.

2

Federal admiralty law, like the *Restatement of Torts*, has gradually moved from the ephemeral consumer expectations test to the more concrete risk-utility test of the *Restatement (Third)*. *E.g.*, *Stark*, 21 F. App'x at 375 (quoting *Restatement (Third)* § 2 cmt. a); *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011) ("Since the *Restatement (Third)* was [promulgated] we and other circuits have relied on it."); *see generally* Tony Nunes, *Charterer's Liabilities Under the Ship Time Charter*, 26 Hous. J. Int'l L. 561, 586 (2004) ("[T]he U.S. Supreme Court has recognized that the law of products liability is part of the general maritime law. U.S. courts currently apply, among other tests used to determine liability, the rule set forth in section 2(b) of the *Restatement (Third) of Torts: Products Liability*.").

Indeed, the Sixth Circuit has noted in passing that not applying risk-utility analysis in a maritime case can constitute reversible error. *Stark*, 21 F. App'x at 375 (citing *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000)).

Plaintiff's objection that the report errs in concluding that "the *Restatement (Third) of Torts* applies in maritime product liability cases" lacks merit. The objection will be overruled.

### B

Plaintiff next objects to the report's recommendation that Benson be granted summary judgment on Plaintiff's strict liability and negligent design claims. Plaintiff reiterates: "Presuming Michigan does not recognize strict liability, maritime law expressly adopts it pursuant to *Restatement (Second)* § 402A." Pl.'s Objections 4 (italics supplied). Plaintiff further asserts that "the risk-utility balancing test is not the test that applies in maritime product liability cases, nor is it required under *Restatement (Second)* § 402 A." *Id.* at 7–8 (italics supplied).

For reasons discussed above, Plaintiff is correct that federal admiralty law rather than state law applies. And Plaintiff is correct that the text of the *Restatement (Second)* does not expressly require risk-utility balancing. But Plaintiff is not correct that risk-utility balancing is unnecessary. Nor, for reasons detailed below, is Plaintiff correct the report errs in recommending that Benson be granted summary judgment on Plaintiff's design defect claims.

### 1

"Strict liability" for design defects is not, strictly speaking, "strict." *E.g.*, *Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1351 n.5 (6th Cir. 1987) (en banc) (explaining that "strict liability in a products liability case does not impose absolute liability"); *see also Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465 (5th Cir. 1976) ("Strict products liability . . . does not mean that a seller is an insurer for all harm resulting from the use of his product, but merely that the seller is liable to an injured user or consumer if his product is unreasonably dangerous.").[1]

---

[1] As James Henderson, a reporter for the *Restatement (Third)*, explains: "Many jurisdictions, encouraged by broad language in the *Restatement (Second) of Torts*, talk of imposing 'strict liability' on manufacturers for mistakes in design and marketing. . . . But the overwhelming majority of American courts . . . judge the manufacturers' design and marketing efforts against a reasonableness standard that sounds in negligence. The recently promulgated

A decade before the *Restatement (Third)* was promulgated, for example, the Sixth Circuit explained: "The issue in a strict liability products case is . . . whether the product, when placed into the stream of commerce, was *reasonably safe* for its intended use in its intended environment." *Chotin Transp.*, 819 F.2d at 1351 n.5 (emphasis supplied). And today, as noted, the Sixth Circuit instructs that whether a design is "reasonably safe" is generally to be "assessed through use of risk-utility balancing." *Stark*, 21 F. App'x at 375 (quotation marks omitted) (citing *Restatement (Third)* § 2 cmt. a).

2

Risk-utility balancing is, fundamentally, an application of the familiar Hand formula. *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Learned Hand, J.) (crafting the formula as a matter of federal admiralty law). The Seventh Circuit explains:

> Judge Hand, designating by "B" the burden of the precautions necessary to avert an accident, by "L" the magnitude of the loss if the accident occurred, and by "P" the probability that if the precautions were not taken the accident would occur, reasoned that a shipowner or other alleged tortfeasor was negligent if B<PL, that is, if the burden of precautions was less than the harm if the accident occurred discounted (i.e., multiplied) by the probability that it would occur.

*U.S. Fid. & Guar. Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1026 (7th Cir. 1982) (Posner, J.); *see id.* (noting that "the formula is a valuable aid to clear thinking . . . . It gives federal district courts in maritime cases, where the liability standard is a matter of federal rather than state law, a useful framework").

The plaintiff bears the burden of showing that the probability and severity of harm outweigh the burden involved in curing the defect. *See Stark*, 21 F. App'x at 378. That is, the plaintiff must show B<PL. Additionally, the plaintiff must show that: (1) the design was

---

*Restatement (Third)* . . . reflects the reality that courts base manufacturers' liability for design and warning on negligence." James Henderson, Jr., *Echoes of Enterprise Liability in Product Design and Marketing Litigation*, 87 Cornell L. Rev. 958, 959 (2002) (footnotes omitted).

defective "at the time of sale or distribution"; and (2) "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design." *Restatement (Third)* § 2(b).

The Sixth Circuit observes that this test generally "requires the plaintiff to produce evidence concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design." *Stark*, 21 F. App'x at 378 n.6 (quotation marks omitted) (quoting *Krummel*, 206 F.3d at 551).

3

Here, Plaintiff makes none of these showings. Nor does he offer evidence demonstrating that the probability and severity of harm outweigh the burden involved in curing the alleged defect.

a

The winch controls began servicing the *Calloway* in 1952. Plaintiff produces no evidence that anyone was injured by the winch controls prior to the incident giving rise to this case — either on the *Calloway* or any other vessel carrying this particular winch design. (Unsurprisingly, since there do not appear to have been any prior accidents, he also does not produce any evidence about the economic costs of prior accidents.) And, as detailed below, he does not offer evidence regarding the extent of the reduction in frequency of accidents that would have followed on the use of his proposed alternative design.

In short, he does not offer evidence to support his prima facie case of design defect. Nor does he carry his burden to create a genuine issue of fact under the Hand formula.

b

Plaintiff's accident occurred in 2007, 55 years after the winch controls began operations. The record contains no evidence that anyone was injured by the winch during this period. (Nor is there any evidence that anyone on other vessels carrying this type of winch control design was injured by the winch.) This suggests that the probability of harm presented by the design of the winch controls is quite low.

The foreseeable magnitude of the loss if an accident occurred is higher. The controls, after all, operate a device powerful enough to sever a thumb. While the inadvertent activation of the winch could result in nothing more than a line being harmlessly paid out or heaved in, it could also result in serious injury.

Thus, on one side of the equation is a low risk of harm with a higher foreseeable magnitude of injury. In Hand formula terms, little P, somewhat larger L.

Plaintiff, as noted, has the burden of suggesting an alternative design which possesses benefits exceeding its costs. He does not do this. More precisely, while Plaintiff's expert, Bartley Eckhardt, proposes three alternative safety features, he provides no evidence on the costs and only the slightest of evidence on the benefits of such a design.

c

The three additional safety features proposed by Plaintiff's expert are: (1) placing a warning light on the controls; (2) relocating the controls forward or aft; and (3) reorienting controls' handles so that the off position was located parallel rather than perpendicular to the bulkhead. *See* Eckardt Report 8–12, *attached as* Benson's Mot. Summ. J. Ex. 9.

-16-

i

Plaintiff's expert first proposes that a warning light should have been installed to indicate when the winch was in operation.  Eckhardt Report 11–12.  The gentleman bases his opinion on the American Society for Testing and Materials Standard F1166, *Human Engineering Design for Marine Systems*.

But as Benson pointedly observes, this standard was first published in 1988, more than three decades after the winch controls began servicing the *Calloway*.  The relevant time period for a design defect claim, as noted, is "the time of sale or distribution."  *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012) (quoting *Restatement (Third)* § 2).  Plaintiff's reliance on Standard F1166 is thus misplaced.

Moreover, Plaintiff himself calls into question the utility of such a device.  Asked "what do you believe could have prevented your injuries?" he responded:

> [If an] extra man was down there [with me setting lines], without a light, but being they had to force me to do it, I'm answering that question saying *maybe, just maybe* had there been a light with the noise here, that would have caught my attention, because I was alone.
>
> If there was another man working there, he would have said, hey, the winch is running or whatever.  There would have been two people working on the cable.  This where that answer comes in that simply says that that was for — I was alone.  And being as I'm alone, I didn't know it.  But if there was another man down there we wouldn't be here today because that other man, we would have known the winch was running.

Dehring Dep. 103–104, Feb. 2, 2013 (emphasis and paragraph break supplied), *attached as* Benson's Mot. Summ. J. Ex. 1.

Plaintiff thus expresses unequivocal confidence that "if there was another man down there we wouldn't be here today."  *Id.*  But how many people set the bowlines is not an issue of product design; it is one of crew staffing.

In contrast, Plaintiff expresses little confidence that a light would have made a difference, speculating that "maybe, just maybe . . . that would have caught my attention." *Id*. at 103. In short, Plaintiff offers only his own speculation regarding the utility of a warning light, and ambivalent speculation at that.

ii

Next, Plaintiff's expert proposes that the winch controls "should have been located forward or aft in a safer location that would guard the crew from hazards by forcing a two-man operation." Eckhardt Report 9. Plaintiff's expert goes on: "Defendant's installation of the deck edge winch controls aboard the Cason J. Calloway created unreasonably dangerous conditions." *Id*. at 10.

Even if the location of the controls was sub-optimal (which is by no means obvious[2]), Plaintiff offers no evidence that Benson was responsible for this alleged defect. When Plaintiff's expert was asked if he had any evidence that Benson was responsible for where the controls were located, the expert responded: "I don't have evidence one way or another." Eckhardt Dep. 79, Aug. 30, 2012, *attached as* Benson's Resp. to Pl.'s Mot. Summ. J. Ex. 5. Asked whether he was aware that "Benson designed the control panel only and shipped it to the ship, [and] someone else then configured it and designed where it would be placed on the ship?" the expert replied: "I don't know that." *Id*.

Plaintiff likewise offers no evidence that Benson was responsible for the winch control's location. Thus, Plaintiff has not demonstrated that Benson was responsible for this alleged defect.

---

[2] As an aside, it should be noted that it is by no means obvious that the location is suboptimal. Benson's expert certainly didn't think so — in fact, he thought the controls were well positioned. *See* Booker Dep. 54–55, May 25, 2012, *attached as* Benson's Mot. Summ. J. Ex. 13.

iii

Finally, Plaintiff's expert asserts that the winch controls should have been reoriented so that in the off position the handles would be parallel rather than perpendicular to the bulkhead and rail. He writes: "Such an arrangement is very intuitive and is commonly utilized aboard ships of virtually any vintage." Eckhardt Report 10. In support, he again relies on Standard F1166. *Id.*

As noted, Plaintiff's reliance on Standard F1166 is misplaced. The relevant time period for a design defect claim is "the time of sale or distribution." *See e.g.*, *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012) (quoting *Restatement (Third)* § 2). And Plaintiff offers no other evidence, aside from his expert's assertion that his proposal is "very intuitive," to suggest that reorienting the levers would reduce the risk of inadvertent activation. Plaintiff does not show that the utility of such a design outweighs its own set of risks. Nor does he show that its benefits exceed its costs.

d

In sum, Plaintiff has not established his prima facie case of design defect. He has not offered any evidence establishing "the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design." *Stark*, 21 F. App'x at 378 n.6 (quotation marks omitted) (quoting *Krummel*, 206 F.3d at 551). Nor does he carry his burden to create a genuine issue of fact under the Hand formula.

Plaintiff's objection to the grant of summary judgment to Benson on Plaintiff's strict liability and negligent design claims will be overruled.

C

Plaintiff next objects to the recommendation that Benson be granted summary judgment on Plaintiff's failure to warn claim.

1

a

The report found this claim lacking in merit for several reasons. Two merit particular attention. One is that "the danger of winch controls starting movement of a winch is an open and obvious danger for which a warning would be superfluous." Report and Recommendation 19. Another is that "[t]o the extent that Plaintiff has argued that Defendant Benson should have included a warning on the winch controls itself . . . the Shipowner/Operator Defendants who purchased the winch controls were sophisticated users who were in the best position to warn the ultimate user." *Id*. at 18 (quotation marks omitted) (quoting *Portelli v. I.R. Constr. Prods. Co*., 554 N.W.2d 591, 596 (Mich. Ct. App. 1996)).

b

Plaintiff, in turn, objects to both these recommendations. First, Plaintiff asserts that his claim cannot "be barred based on an open and obvious condition where it was the only means by which Plaintiff could perform the job tasks he was assigned. The unsafe winch control was the only one furnished with which to do the job." Pl.'s Objections 17 (citing *Pluyer v. Mitsui O. S. K. Lines, Ltd.*, 664 F.2d 1243 (5th Cir. 1982)). And second, Plaintiff asserts that his failure to warn claim is not subject to the sophisticated user defense. Pl.'s Objections 12–17 (citing *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333 (E.D. Pa. 2012)).

2

A product is defective "when, at the time of sale or distribution . . . the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller . . . and the omission of the instructions or warnings renders the product not reasonably safe." *Restatement (Third)* § 2(c); *see, e.g.*, *Krummel*, 206 F.3d at 552 (applying § 2 to a failure to warn claim).[3]

As with design defect claims, the Sixth Circuit instructs that an "assessment of advantages and disadvantages of a product, to which some attach the label 'risk-utility balancing,' is necessary for . . . failure-to-warn claims." *Stark*, 21 F. App'x at 375 (brackets omitted) (quoting *Restatement (Third)* § 2 cmt. a); *see also Krummel*, 206 F.3d at 552 (reversing district court decision for not applying risk-utility analysis to failure to warn claim).

Here, as with Plaintiff's design defect claim, Plaintiff offers no evidence regarding how a warning on the winch controls would have reduced the risk of inadvertent activation. Nor, indeed, is it obvious what such a warning could be.

In contrast, the risk of inadvertent activation posed by the winch controls is obvious. Apply force (intentionally or not) to the lever and the winch will move. Which leads to Plaintiff's first objection.

a

A product manufacturer is ordinarily not required to warn about open and obvious risks. *Restatement (Third)* § 2 cmt. j; *see, e.g.*, *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 709 (6th Cir. 1994) (applying Michigan law and discussing "the well-established rule that there is no duty to

---

[3] Section 402A of the *Restatement (Second)* is in accord. *See id.* cmts. g, j (noting that "to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use" but that liability attaches only if the product is unreasonably dangerous "at the time it leaves the seller's hands").

warn of dangers that are open and obvious").[4]   The reason for the rule, the official comments to

the *Restatement (Third)* explain, is premised on cost-benefit analysis:

> Warning of an obvious or generally known risk in most instances will not provide
> an effective additional measure of safety.  Furthermore, warnings that deal with
> obvious or generally known risks may be ignored by users and consumers and
> may diminish the significance of warnings about non-obvious, not-generally-
> known risks.  Thus, requiring warnings of obvious or generally known risks could
> reduce the efficacy of warnings generally.

*Restatement (Third)* § 2 cmt. j; *see generally* James Henderson, *Doctrinal Collapse in Products

Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U. L. Rev. 265, 282 (1990) ("[T]he

obviousness of a product-related risk invariably serves the same function as a warning that the

risk is present.  Thus, nothing is to be gained by adding a warning of the danger already

telegraphed by the product itself.").

    Here, as he must, Plaintiff acknowledges that the risk of inadvertent activation posed by

the winch controls is obvious.  Apply force to the lever, the winch moves.  But he counters that

his claim cannot "be barred based on an open and obvious condition where it was the only means

by which Plaintiff could perform the job tasks he was assigned.  The unsafe winch control was

the only one furnished with which to do the job."  Pl.'s Objections 17 (citing *Pluyer v. Mitsui O.

S. K. Lines, Ltd.*, 664 F.2d 1243 (5th Cir. 1982)).  Plaintiff's reliance on *Pluyer* is misplaced.

    That case arose out of a metal ladder that did not have rubber feet to prevent the ladder

from slipping on a metal deck.  664 F.2d at 1245.  As the plaintiff descended the ladder slipped

and he fell to the deck, injuring himself.  *Id*.  The trial court concluded that the vessel was

negligent because the ladder was unsafe and "that the fact that the danger inherent in the use of

the ladder was open and obvious did not bar [the plaintiff's] recovery."  *Id*. at 1247.  The Fifth

---

[4] The *Restatement (Second)* is again in accord.  *See id*. § 402A cmt. j.

Circuit affirmed, explaining: "A ladder was necessary for [the plaintiff] to perform his assigned tasks.  The unsafe ladder was the only one furnished."  *Id*.

Here, for reasons detailed above Plaintiff's assertion that the winch controls were "unsafe" lacks merit.  *Pluyer* is thus inapposite.  Plaintiff's objection to the report's recommendation that Benson is entitled to summary judgment on the failure to warn claim will be overruled.

b

Although not necessary to the resolution of Plaintiff's failure to warn claim, it should also be noted that Benson is entitled to summary judgment based on the sophisticated user doctrine.

i

A manufacturer, the *Restatement (Third)* provides, is not subject to liability for failing to warn of risks that "should be obvious to, or generally known by, *foreseeable product users*." *Restatement (Third)* § 2 cmt. j (emphasis supplied).

The sophisticated user doctrine is an application of this general principle: "under maritime law . . . a manufacturer or supplier of a product has no duty to warn an end user who is 'sophisticated' regarding the hazards of the product."  *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 335 (E.D. Pa. 2012); *see also Portelli v. I.R. Const. Prods. Co., Inc.*, 554 N.W.2d 591, 596 (Mich. Ct. App. 1996) (applying Michigan law and noting that "[a] seller or manufacturer should be able to presume mastery of basic operations by experts or skilled professionals in an industry, and should not owe a duty to warn or instruct such persons on how to perform basic operations in their industry" (quoting *Ross v. Jaybird Automation, Inc.*, 432 N.W.2d 374 (Mich. Ct. App.1988)); *see generally* Henderson, *Doctrinal Collapse*, at 283 ("Under traditional failure-to-warn doctrine . . . the duty owed to the particular plaintiff will be judged by the category of users

or consumers into which the plaintiff falls.  If the plaintiff is an expert, no duty to warn may be owed him even if such duties are owed to non-expert users or consumers.").

Under federal admiralty law "a 'sophisticated user' is an end user who either knew or belonged to a class of users who, by virtue of training, education, or employment could reasonably be expected to know of the hazards of the product at issue." *Mack*, 896 F. Supp. 2d at 343.

Plaintiff, a seaman with over 20 years of experience, knew that applying force to the lever (whether deliberately or accidentally) would set the winch in motion.  Benson informing him of this fact was wholly unnecessary.  Benson is entitled to summary judgment on Plaintiff's failure to warn claim.

ii

Arguing against this conclusion, Plaintiff objects that "the defense of the sophisticated user does not apply to strict products liability claims but only to negligence based claims. . . .  Thus, Plaintiff's product liability claims for inadequate warnings and design defects are not subject to the sophisticated user defense."  Pl.'s Objections 13.  In support of his argument, Plaintiff relies on a district court decision from Pennsylvania, *Mack v. General Electric Co.*, 896 F. Supp. 2d 333 (E.D. Pa. 2012).

Plaintiff correctly identifies the rule announced in *Mack*.  That decision, however, is flawed.  There, the court concluded that "the 'sophisticated user' defense may only be raised against negligent failure to warn claims," not "strict liability claims pertaining to defective or inadequate warnings."  *Id*. at 344 (footnote omitted).  The court explained: "negligence law focuses on the reasonableness of defendants' conduct, while strict liability focuses on defendants' product without regard to conduct or fault.  It follows logically that the duty to warn

cannot depend on a particular user's knowledge or level of sophistication."  *Id*. (ellipsis and bracket omitted) (quoting  *Menna v. Johns–Manville Corp*., 585 F. Supp. 1178, 1184 (D.N.J. 1984)).

This logic does not hold up to even  casual inspection.[5]  The purpose of the duty to warn is to inform the audience of a product's non-obvious risks.  What risks are non-obvious depends on the audience — risks that may not be obvious to a layman may be obvious to the skilled professional.  The sophisticated user doctrine is thus not an exception to the duty to warn, but an application of it.  A manufacturer is not liable for failing to warn of risks that "should be obvious to, or generally known by, foreseeable product users."  *Restatement (Third)* § 2 cmt. j (emphasis supplied).   When the foreseeable users are skilled professionals in an industry instead of unsophisticated novices, the risks that are obvious will be different.

Plaintiff's objection to the recommendation that Benson be granted summary judgment on the failure to warn claim will be overruled.

D

Finally, Plaintiff objects to the report's recommendation that his motion for partial summary judgment on the unseaworthiness of the *Calloway* be denied.  Asserting that he is entitled to judgment on this claim as a matter of law, Plaintiff writes: "Contributory negligence as alleged by the Defendant with regard to Plaintiff's failure to close the cover does not cancel out Plaintiff's unseaworthiness claim as such 'all or nothing' defenses are inequitable."  Pl.'s Objections 21.

Plaintiff's objection lacks merit.  "Generally, unseaworthiness is a question of fact for the jury and should not be resolved by the district court as a matter of law."  *Churchwell v.*

---

[5] *Mack*, it should be noted, has not been cited by any court, aside from the federal district courts of Pennsylvania, where the case was decided.

*Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006) (citing *Cook v. Am. S.S. Co.*, 53 F.3d 733, 742 (6th Cir. 1995)).  Likewise, the Sixth Circuit instructs that comparative negligence is generally a question of fact:

> This defense requires evidence that the seaman chose to perform a task in a manner that placed him in danger despite the fact that there were alternative means available to him.  If such evidence exists, the issue of the plaintiff's comparative negligence is submitted to the jury and the plaintiff's damages are reduced by the degree of fault that the jury assigns to plaintiff's behavior.

*Churchwell*, 444 F.3d at 908 (quotation marks, citations, and ellipsis omitted) (quoting *Wilson v. Maritime Overseas Corp.,* 150 F.3d 1, 11 (1st Cir.1998); and citing *Miller v. Am. President Lines, Ltd*., 989 F.2d 1450, 1459-63 (6th Cir. 1993).

Here, evidence that alternative means were available to Plaintiff has been offered by Defendants.  First, the captain of the Calloway at the time of the accident, David Wolfe, testified that Plaintiff should have closed the winch controls' cover before attempting to free the line.  In his deposition, he was asked:

> Q:     [T]he winch control guard was raised?
>
> A:     Yes, that is the number one problem is he didn't make sure that they weren't — that's the safety device to lock the winch from operating.

Wolfe Dep. 31, Aug. 23, 2012, *attached as* Defs.' Resp. to Pl.'s Mot. Summ. J. Ex. B.  A fellow deckhand, Craig Collins, testified that when he preps lines he closes the cover.  In his deposition, he was asked:

> Q:     [W]hen you're doing something like getting ready to make a lock like Mr. Dehring was doing that day, would you typically have the lid closed while you were handling the cable and things of that nature?
>
> A:     Yes.

Collins Dep. 48, Mar. 15, 2012, *attached as* Defs.' Resp. Ex. D.  Additionally, Captain Wolfe testified that Plaintiff should have asked for assistance.  In his deposition, he was asked:

-26-

Q:    You're suggesting that Mr. Dehring should have asked for help to pull in the lines?

A:    Yes.  And he had been told that if he has a problem in any way, shape or form on anything that you do, and I have safety meetings to prove that, call for help and we will bet help —

Q:    Okay.

A:    — we will send people.

Q:    That's presuming he knew he needed help at this instance?

A:    Yes, if he, if [he] should have.  If you have something that is difficult, and it gone before that we say if you, if you encounter any kind of problem stop and get help.

Wolfe Dep. 49–50.  Based on this evidence, a reasonable factfinder could conclude that there were alternative means available to Plaintiff.  He could have closed the cover.  He could have called for assistance.  The issue of his comparative negligence is one for the jury.  Plaintiff's objection will be overruled and his motion for partial summary judgment denied.

                                                    IV

        Accordingly, it is **ORDERED** that the report and recommendation (ECF No. 92) is **ADOPTED**.

        It is further **ORDERED** that Plaintiff's objections (ECF No. 96) are **OVERRULED**.

        It is further **ORDERED** that Benson's motion for summary judgment (ECF No. 80) is **GRANTED**.

        It is further **ORDERED** that Plaintiff's motion for partial summary judgment (ECF No. 83) is **DENIED**.

                                                        s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge

        Dated: July 26, 2013

                                                   -27-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 26, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS